Colonel Winford E. Philips Director, Arkansas State Police
1 State Police Plaza Little Rock, Arkansas 72209-4822
Dear Colonel Philips:
I am writing in response to your request for an opinion regarding A.C.A. § 17-23-102 (Repl. 2001). You ask the following:
 The Department of Arkansas State Police administers the Precious Metals Dealer License provisions in A.C.A. §§ 17-23-101 et seq.
. . . A question has arisen as to the applicability of an exemption under A.C.A. § 17-23-102[, which states]:
 The [licensing] provisions of this chapter shall not apply to . . . [a]ny financial institution, which is covered by federal or state deposit insurance, or any person doing business under the laws of this state. . . .
 Under § 17-23-101, [the term "person" is defined as follows]: "As used in this chapter, unless the context otherwise requires . . . `Person' means any individual, partnership, corporation, association, or other business entity. . . ."
 The Department's position is that subsection 17-23-102(5) creates an exemption from licensing for any financial institution, which is covered by federal or state deposit insurance or any person (acting as a financial institution) doing business under the laws of this state. *Page 2 
 The Department's interpretation of the applicability of the exemption has been questioned. The opposing opinion is that subsection 17-23-102(5) creates an exemption from licensing for any person who is doing business under the laws of this state.
 Does the exemption contained at A.C.A. § 17-23-102(5) apply to all persons doing business under Arkansas law or is the exemption only available to persons acting as a financial institution doing business under the laws of this state?
RESPONSE
The exemption you ask about is subject to several interpretations. Because each interpretation has strong arguments in its favor, I cannot predict with any degree of certainty how a court would answer this question. I can and will, however, explain the alternative interpretations. Legislative clarification of this issue appears warranted.
DISCUSSION
Because your question is largely one of statutory interpretation, I begin by explaining the key canons of statutory construction. One of those canons is that courts will overturn an agency's interpretation of a statute only if the agency is clearly wrong. After explaining precisely what the Department's interpretation amounts to, I explain three other outcomes a court could reach. Because each outcome has strong arguments for and against it, I cannot determine with any appreciable degree of certainty whether a court would hold that the Department's interpretation is clearly wrong.
When one is interpreting statutes, one's primary aim must be to give effect to the legislature's intent. Smith v. Fox,358 Ark. 388, 392, 193 S.W.3d 238, 241 (2004). To do that, the Arkansas Supreme Court requires that we "construe the statute just as it reads, giving the words their ordinary and usually accepted meaning in common language. . . ." E.g., Brown v. State,375 Ark. 499, 502, 292 S.W.3d 288, 290 (2009). Courts read statutes so that no word is left void, superfluous, or insignificant; and meaning and effect are given to every word in the statute if possible. E.g., Arkansas Oklahoma Gas Corp. v. MacSteel Div. ofQuanex, 370 Ark. 481, 485, 262 S.W.3d 147, 150 (2007). If a statute's meaning is clear, then courts will not resort to the rules of statutory construction. Id., 262 S.W.3d at 150. *Page 3 
If, however, a statute's meaning is not clear, then courts will "look to the language of the statute, the subject matter, the object to be accomplished, the purpose to be served, the remedy provided, the legislative history, and other appropriate means that shed light on the subject." Id., 262 S.W.3d at 150
Ordinarily, a court affords great deference to an agency's interpretation of statutes, even though that interpretation is not binding. E.g., Ark. State Medical Bd. v. Bolding,324 Ark. 238, 244, 920 S.W.2d 825, 829 (1996). A court will only overturn an agency's interpretation of a statute if it is clearly wrong. Id.; Op. Att'y Gen. Nos. 2008-123, 2001-216.
You relay the Department's interpretation of subsection 17-23-102(5) in your background facts. You indicate that the Department reads subsection 17-23-102(5) as follows: "The [licensing] provisions of this chapter shall not apply to . . . [a]ny financial institution, which is covered by federal or state deposit insurance, or any person [acting as a financialinstitution] doing business under the laws of this state. . . ." (Emphasis added.) The emphasized language makes clear the Department's apparent view that the initial mention of "any financial institution" restricts the extension of the phrase "any person." Under this reading, the fact that the exemption for "any person doing business under the laws of this State" appears in the same statutory subsection as certain FDIC-insured financial institutions is dispositive.
I cannot say whether the Department's interpretation is clearly wrong because there appear to be at least three alternative interpretations that a court would likely consider when evaluating the Department's interpretation. Because the arguments for and against each alternative interpretation are all strong, it is difficult for me to predict, with any appreciable degree of certainty, what a court would do.
Another interpretation might be called the plain-language reading. This reading is essentially the "opposing" interpretation you describe in your background facts. Subsection 17-23-102(5) exempts from licensing "[a]ny financial institution, which is covered by federal or state deposit insurance, or any person doing business under the laws of this state. . . ." (Emphasis added.) Section 17-23-101(1) defines a "person" as "any individual, partnership, corporation, association, or other business entity. . . ." Therefore, according to the statute's plain language, any "individual" or any "business entity," doing business under Arkansas law qualifies for the exemption. *Page 4 
In my opinion, a court would probably reject this interpretation because it exempts virtually every person or business doing business under Arkansas law, which leads to the absurd result that the licensing provisions have no effect at all. Courts will not give a statute a literal interpretation if doing so leads to absurd consequences that are contrary to the legislative intent. E.g.,Mamo Transp., Inc. v. Williams,375 Ark. 97, 100, 289 S.W.3d 79, 83 (2008). Because this cannot have been the legislature's intent when it enacted the licensing provisions in the first place, I believe a court would reject this interpretation. While this interpretation, when considered by itself, would probably be rejected, I mention it here for reasons that will become clear below. There may be countervailing pressures that would compel a court to adopt this interpretation.
As noted above, when a statute's meaning is not clear, courts marshal additional resources to determine and give effect to the General Assembly's intent. Marshaling additional resources leads to a potential third interpretation. These additional resources include closely scrutinizing the two component acts that, together, comprise subsection 17-23-102(5):Act 87 of 1981 and Act 541 of 1981.
For our purposes, Act 87 created two key exemptions from the licensing provisions for "persons," which are defined to "include individuals, copartnerships, associations, and corporations."Act 87 of 1981, § 1. After setting out the general requirement than any "person" buying certain metals must be licensed, Act 87 provides the following two exemptions:
 This Act shall not apply to any financial institution which is covered by federal or state deposit insurance or any person doing business under the laws of this State or the United States relating to any broker-dealer, or Commodity Futures Commission Merchant or Commodity Trading Advisor . . . duly registered and regulated by the Arkansas Securities Department or the United States Commodity Futures Trading Commission.
Act 87 of 1981, § 1.
The General Assembly created these licensing provisions with the hope of reducing residential burglaries of precious metals, which the General Assembly believed to be exacerbated by the lack of records following both the precious *Page 5 
metals and their sellers.[1] Therefore, the General Assembly declared an emergency and Act 87's effective date was February 17, 1981.
Before moving on to evaluate the second component act, it may be helpful to summarize Act 87's scope. The act required all "persons" to be licensed. And "persons" included virtually all individuals and all business entities. But two, very narrow entities were exempted from Act 87's strictures. One entity was a "financial institution" covered by federal or state deposit insurance. The other exempted entity was any "person" doing business under either the laws of Arkansas or the United States relating to a specific activity (i.e., securities or commodities businesses) and duly registered and regulated to conduct that business.
One month after Act 87 became effective, the General Assembly amended it. Act 541, which became effective on March 18, 1981, made two key changes to Act 87. First, Act 541 ostensibly expanded the extension of "person" by adding the following italicized phrase to the list of entities that count as "persons": "For purposes of this Act, the term `persons' means any individual, partnership, corporation, or association or other business entity. . . ."Act 541 of 1981, § 1. So, without looking further into act, the General Assembly appeared to increase the scope of the licensing provisions by ensuring that as many business entities as possible are required to be licensed.
Act 541's second key change is the reason for the confusion. The General Assembly added, among others things, another exemption. Act 541 states: "The provisions of this Act shall not apply to . . . any financial institution which is covered by federal or state deposit insurance or any person doing business under the laws of thisState." Act 541 of 1981, § 1 (emphasis added). The italicized phrase adds confusion because of the way it changes how the term "persons" functions in the statute. In Act 87, "persons" appeared only twice. The first occurrence was in the general rule requiring all "persons" to be licensed. The second occurrence was in the second exemption, which exempted from licensing any "person" that (1) conducted a very specific sort of business (broker-dealer, or *Page 6 
Commodity Futures Commission Merchant or Commodity Trading Advisor) (2) under either Arkansas laws or federal laws and (3) in which business the "person" was regulated and licensed by a certain Arkansas or federal agency. Thus, the term "persons" is expansively defined by Act 87 to require as many people as possible to be licensed. While "persons" is used in one of the exemptions, the extension of "persons" subject to the exemption is severely limited by the three elements.
Act 541 seems to use "persons" in a dramatically different way. By exempting from licensing any "person doing business under the laws of this State," the exemption carries the full scope of the definition (thereby netting virtually all individuals and businesses), but without the limiting elements. As noted above, this appears to create a massive exemption that swallows all the licensing provisions. Because this absurd result is not likely the legislature's intent, we must look for additional resources to uncover that intent.
Act 541's emergency clause gives some insight into both why Act 87 was amended so soon after its birth and why the General Assembly included an exemption for any "person doing business under the laws of this State." A review of the emergency clause seems to indicate that local businesses complained about licensing requirements found in Act 87, which prompted the General Assembly to exempt all in-state businesses from licensing:
 It is hereby . . . determined by the General Assembly that the provisions of Act 87 of 1981 relating to the licensure and regulation of precious metal buyers are unduly restrictive and seriously hamper the operation of any legitimate businesses in the State; that this Act is designed to correct this undesirable and inequitable situation and should be given effect immediately. Therefore, an emergency is declared to exist. . . .
Act 541 of 1981, § 5 (emphasis added).
The emergency clause gives us two insights into the General Assembly's intent behind Act 541. First, the legislature believed that Act 81's licensing provisions hampered the "operations" of "legitimate businesses in the State." Second, the changes Act 541 wrought were intended to alleviate the licensing provisions' restrictions on "any legitimate businesses in the State." These two insights seem to indicate that the General Assembly intended to favor in-state businesses over out-of-state *Page 7 
businesses, which is highly constitutionally suspect.[2] If a court found that the General Assembly did intend to exempt only in-state businesses, the court would be faced with how best to construe subsection 17-23-102(5).[3]
As I noted above, each of the alternative interpretations has strong arguments both for and against it. In the case of the interpretation that finds the exemption unconstitutional, the principle argument against it is that statutes are presumed constitutional and will be so construed if it is possible to do so.Jefferson v. State,372 Ark. 307, 317, 276 S.W.3d 214, 222-23 (2008).
The difficulty involved in ascertaining the General Assembly's intent actually opens the door to yet a fourth potential result. Because violating the licensing provisions is a crime, [4] a court will construe the licensing scheme strictly and resolve all doubts in defendants' favor. E.g., Donaldson v. State,370 Ark. 3, 257 S.W.3d 74 (2007). Thus, given the difficulty in determining the General Assembly's intent, a court may opt for the interpretation that favors defendants as a heuristic to arbitrate the competing interpretations. In this case, the interpretation that favors the defendant is what I have called the plain-language reading, which is roughly the same as the "opposing opinion" you reference in your background facts. While such an interpretation results in an absurdity because the reading makes the exemption swallow the rule, the arbitrating and overriding rule of *Page 8 
resolving ambiguous criminal statutes in favor of the defendant may require such an interpretation in a given case.
In summary, I cannot say whether the Department's interpretation is clearly wrong. There appear to be at least three other readings of this statute. Because there are strong arguments in favor of each interpretation, I cannot predicate with any appreciable degree of certainty how a court would resolve the issue. Legislative clarification appears warranted.
Assistant Attorney General Ryan Owsley prepared the foregoing opinion, which I hereby approve.
Sincerely,
DUSTIN McDANIEL Attorney General
[1] Act 87's emergency clause states: "It is hereby . . . determined by the General Assembly that due to the tremendous increase in the price per ounce of precious metals many citizens are experiencing residential burglaries of precious metals which are subsequently sold to unlicensed dealers where no records are maintained which would identify the property and the individuals selling such property. Therefore, an emergency is hereby declared to exist. . . ." Act 87 of 1981, § 11.
[2] Such an intent likely violates both the Dormant Commerce Clause and the Privileges and Immunities Cause. The latter is found in Article IV, Section 2 of the United States Constitution. The former is, in the words of one scholar, "the name given to the self-executing limitations [on states] inferred from the Commerce Clause [of the United States Constitution] and applied by courts to prohibit states from adopting legislation that discriminates against or impermissibly burdens interstate commerce." Brannon P. Denning,Why the Privileges and Immunities Clause of Article IV CannotReplace the Dormant Commerce Clause Doctrine, 88 Minn. L. Rev. 384, 385, n. 2 (2003).
[3] The court would have to decide whether the unconstitutional portions of the act are severable from the whole licensing scheme. To determine whether the an unconstitutional piece of a statute is severable from the larger whole, courts "look to: (1) whether a single purpose is meant to be accomplished by the act, and (2) whether the sections of the act are interrelated and dependent upon each other." McGhee v. Ark. St. Bd. of CollectionAgencies, 375 Ark. 52, 63-64, 289 S.W.3d 18, 27 (2008). "The mere fact that an act contains a severability clause is to be considered, but is not alone determinative." Id. If a court were to take this interpretation, I believe it would likely find the exemption at issue severable because the other licensing provisions are not dependant on the meaning of one of several exemptions.
[4] A.C.A. § 17-23-103. *Page 1